# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| United States of America<br>v.<br>Parris Frazier<br>Robert Deatherage<br>Erik Foster<br>*Defendants* | Case No. 15-7485 MJ |

## CRIMINAL COMPLAINT

I, John E. Kelly, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief.

On or about July 22, 2015, defendants Parris Frazier, Robert Deatherage, and Erik Foster did knowingly and intentionally combine, conspire, confederate and agreed together and with others to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, its salts, optical and geometric isomers, and salts of isomers, a Schedule II Controlled Substance, in violation of Title 21, United States Code, § 841(a)(1) and 846.

I further state that I am a Task Force Officer with the Federal Bureau of Investigation (FBI) and that this complaint is based on the following facts:

**See Attached Statement of Probable Cause Incorporated By Reference Herein**

AUTHORIZED BY: AUSA Lisa E. Jennis

☒ Continued on the attached sheet.

*Complainant's signature*

John E. Kelly, FBI Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 23, 2015

*Judge's signature*

City and state: Phoenix, Arizona

Hon. Bridget S. Bade, U.S. Magistrate Judge
*Printed name and title*

## STATEMENT OF PROBABLE CAUSE

I, John E. Kelly, being duly sworn, hereby depose and state as follows:

1.  I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) and have been and have been assigned as an FBI TFO since April 2013. Currently, I am assigned to the Phoenix Division FBI Joint Terrorism Task Force (JTTF), squad NS-3, in Phoenix, Arizona. This squad is responsible for investigating many different types of criminal violations including domestic terrorism, weapons of mass destruction, illegal militia activities, and illegal sovereign citizen activities. As an FBI TFO, your Affiant is authorized to investigate violations of federal law, and execute warrants issued under the authority of the United States. Based upon my personal participation in this matter, consultation with other law enforcement Officers/Agents, and review of the records, I have learned the following facts:

2.  On January 24, 2015, Customs and Border Patrol (CBP) agents encountered PARRIS FRAZIER during a traffic stop. During the encounter, FRAZIER portrayed himself as someone that wanted to assist Border Patrol in stopping illegal border activities and asked for information on the illegal activities they had seen lately. CBP agents mentioned that an informal source had been providing them with information regarding illegal border activities, but they could no longer operate that source. FRAZIER expressed his interest in contacting the source so he could use the source's information to assist in protecting the border.

3.  On February 11, 2015, an undercover employee (UCE) of the Federal Bureau of Investigation was introduced to FRAZIER posing as the informal CBP source that CBP agents had told FRAZIER about on January 24, 2015. This introduction took place via a recorded

2

telephone conversation that the UCE had with FRAZIER. In the conversation, the UCE asked what FRAZIER was looking for so he can start looking for jobs. FRAZIER said that he had a small group of Patriots that he trusted and they were trying to take care of (steal) anything that came up out of Mexico (drugs) or was going back into Mexico (bulk cash), but they preferred the cash loads going south. FRAZIER told the UCE that if he provided decent intel on stuff going south (bulk cash), FRAZIER would give the UCE a percentage of whatever is taken. FRAZIER said that his group is a bunch of professionals and none of them are tied up in law enforcement.

4. On March 4, 2015, the UCE recorded an in-person meeting with FRAZIER. In the meeting FRAZIER said that if the UCE knows when it is going (speaking of cash loads going south) that he was good with giving the UCE 25% of the take because they "just want in on it." He also mentioned that "if we (his group) have to dispatch (kill) some people, we will dispatch some people." FRAZIER said that his guys are mercenaries and they just want to rip cash. However, he also said that he planned on killing all of the individuals guarding the cash to ensure that his guys go home at night. In addition, FRAZIER offered to kill anyone that the UCE wanted taken out. Finally, FRAZIER said that he is also interested in acquiring any automatic weapons that the cartel guards may be carrying. FRAZIER asked the UCE to give him five days to get his group together because his people have to come in from out of state.

5. On March 11, 2015, during a recorded telephone conversation between the UCE and FRAZIER, FRAZIER told the UCE that he had a new "drop phone." The UCE called FRAZIER on the new cell phone and recorded the conversation. During this call, FRAZIER explained that the new phone would be used solely to communicate with the UCE. They talked about a possible job coming up in the future and the UCE asked if FRAZIER has enough guys.

FRAZIER said he has as many as he needs. FRAZIER asked about where the job would be and said his only concern would be running into friendly fire. He said he doesn't want to be "rolled up on this." FRAZIER said he would like GPS coordinates for the job location so he and his guys can get there before the package shows up. FRAZIER said that when the job does go down, "it will be very violent and very quick." He said that they can't leave any witnesses.

6. On March 25, 2015, the UCE conducted a recorded call with FRAZIER and told him the UCE might have a job next week in his cousin's area. The UCE said he is going with his cousin to drop off a vehicle with $20,000. He said that if that gets taken off, it will make the UCE's uncle mad at the cousin. The UCE said that if he can get the cousin out of the picture, then the UCE will be able to provide bigger stuff that his cousin will get blamed for. The UCE said that his uncle is making the cousin personally drop off the vehicle with the money. The UCE said that he and his cousin are going to drop off the vehicle and leave it so the backpackers can load it and take it up to Phoenix. The UCE said that FRAZIER and his group can get in the vehicle and take the cash before the backpackers arrive so that it makes the UCE's cousin look like an idiot. FRAZIER said that he just needs a location, a time, and the vehicle description.

7. On April 2, 2015, FRAZIER and an associate attempted to steal money from a staged "cartel load vehicle" that contained $8,000. The attempted cash rip was observed by FBI surveillance and captured by video surveillance equipment outside the vehicle and audio/video equipment inside the vehicle. During the rip, FRAZIER and his associate were dressed in camouflage clothing and were wearing facemasks. They also had on tactical vests and were carrying AR-15 style assault rifles with optical sights. Both individuals were observed searching the vehicle; however, the $8,000 in cash was not taken.

8. On April 2, 2015, after the attempted rip, the UCE conducted a recorded call with FRAZIER. During the conversation, FRAZIER said he and another guy searched the load vehicle but didn't find anything. The UCE tells FRAZIER that the cartel members found $8,000 in the vehicle but it looked like his cousin had pocketed the other $12,000 that was supposed to be there. FRAZIER explained how he and his guy searched through the vehicle for several minutes. FRAZIER asked if the UCE has something else coming up soon.

9. On April 9, 2015, the UCE conducted a recorded call with FRAZIER. FRAZIER asked if the UCE had another job for him. The UCE said he might have something coming up soon. FRAZIER said it looked like the UCE was slowly trying to get his cousin out of the way. The UCE said that was correct. FRAZIER said, "How about I lay an offer out on the table that we just get him out of the way for you." The UCE asked how they would do that. FRAZIER said he has someone that could take care of it if they could be set up somewhere before the UCE's cousin arrived. FRAZIER said that they could solidify an ongoing business venture from there. The UCE asked if he is going to have to pay them for killing his cousin and FRAZIER responded, "Yeah, we'll have to definitely get something monetarily out of it." FRAZIER said that the UCE would then be in a better position and that his guys are the ones to take care of any other competition that may get in the way of the UCE. FRAZIER said he still can't believe that they missed the money in the last job. The UCE asked if they want to do one more load vehicle and then take care of his cousin. FRAZIER agreed. FRAZIER said that he is offering the UCE a faster route to get rid of his cousin. FRAZIER said that it won't be cheap, but it won't be super expensive. FRAZIER said that he and his guys are mercenaries.

10. On April 19, 2015, the UCE conducted a recorded call with FRAZIER. The UCE asked if FRAZIER is ready for something on Thursday or Friday. FRAZIER said that those days are

5

good and asks if the UCE would have more intel so FRAZIER can be closer. The UCE said he hopes so, but it depended on what way the backpackers go and when he finds out when they can be there. FRAZIER said that after this job they should meet in person to discuss the other thing (murder for hire) because FRAZIER doesn't want to talk about that over the phone. FRAZIER again said that Thursday or Friday would work for him because that gives him time to take care of some things and to brief up his guys. FRAZIER asked what kind of impact it would have if he had 3 - 5 guys pick off the load (drug load) as well. The UCE said he is still trying to make his cousin look bad so it would be better if they didn't take the drugs.

11. On April 22, 2015, the UCE conducted a recorded call with FRAZIER. The UCE asked if FRAZIER was available to do the job the next day at 5:00 a.m. FRAZIER said that he is good to go. The UCE said they are going to park the vehicle in Gila Bend at the Yucca motel. FRAZIER asked how much money will be in the vehicle. The UCE said that it will be 20 ($20,000). FRAZIER verified that the UCE was going to call him in the morning with the final details and told the UCE to call his other phone if he can't reach him on this one.

12. On April 22, 2015, the UCE conducted another recorded call with FRAZIER and told him that the time and location have changed due to Border Patrol activity in the area. FRAZIER said he has that whole area around the hotel mapped out, so he just needed to find out where it will be. FRAZIER said he will be in that area waiting and would expect a phone call in the morning.

13. On April 23, 2015, the UCE conducted a recorded call with FRAZIER. The UCE asked if FRAZIER was ready. FRAZIER said that they have been ready. The UCE gave him the latitude and longitude coordinates for where they parked the vehicle. FRAZIER verified that there won't be anyone out there with the vehicle, but there would be people watching

6

them. FRAZIER said that they aren't really worried about it getting too hot (with the cartel response), they are worried more about LEO (law enforcement officers) than anything else.

14. On April 23, 2015, FRAZIER and his associate stole $7300 from a staged "cartel load vehicle." The cash rip was observed by FBI and Phoenix PD surveillance and captured by video surveillance equipment outside the vehicle and audio/video equipment inside the vehicle.

15. On April 23, 2015, the UCE conducted another recorded call with FRAZIER. The UCE asked how it went. FRAZIER said there was only $7300. The UCE said his cousin must have taken the rest of the money when he was driving the vehicle down there. The UCE said he's got to sort everything out. FRAZIER told him to do that and then call if he has another job. The UCE said they should meet up to discuss the other thing (murder for hire).

16. On June 21, 2015, the UCE conducted another recorded telephone call with FRAZIER. The UCE said he hasn't been able to get a hold of FRAZIER for a while. FRAZIER said he picked up a job in the Midwest and has been out of town. The UCE said he had everything set up (for the murder for hire) but he was never able to get a hold of FRAZIER. FRAZIER said he had to leave in a hurry for a job and didn't have his burn phone with him. The UCE asked if they are still going to do stuff. FRAZIER said he was going to ask the UCE the same question. He said he knows they missed the opportunity in California and told the UCE to tell him if he had any more ideas. The UCE asked if FRAZIER wanted anything else in the meantime while they earned back each other's trust. FRAZIER asked if the UCE knows of any cash that could be "jumped up on." The UCE said cash will be hard since it is so hot, but they could do some regular loads that the UCE could buy off of them or sell and then get FRAZIER the money. FRAZIER said they could do that and asked when the next job would be. The UCE said he will start looking. The UCE asked if FRAZIER was willing to take down some loads and FRAZIER

said he would like to grab the cash and then wait for the load to show up. The UCE said he won't be able to get the cash until he sold the load off. FRAZIER clarified that the UCE knew of some loads that they could rip and then get the money from the UCE for the drugs.

17. On June 28, 2015, the UCE conducted another recorded telephone call with FRAZIER. FRAZIER asked what the UCE has. The UCE said he has a load coming up in late July. FRAZIER asked what will be in the vehicle. The UCE said it will be between six to ten kilograms of cocaine, maybe a little more. FRAZIER asked what the UCE is willing to pay for it and the UCE replied that he will pay FRAZIER $15,000 per kilo. FRAZIER said that is good, he just wanted to know the details of where and when with enough time so he could plan. FRAZIER said they will definitely do this one, but then said he wants to talk to his teammates first to make sure everyone was on-board. The UCE said he will be able to pay FRAZIER on delivery of the drugs. They agreed to talk again about it as they get more details. FRAZIER said he is meeting with his group next weekend to discuss everything.

18. On July 10, 2015, the UCE conducted another recorded telephone call with FRAZIER. The UCE asked if everything is good. FRAZIER said it is all good on his end. The UCE said that his buddy called him and said he should be driving up the load vehicle on the 19th, 20th, or 21st. The UCE also told FRAZIER that the group will probably use a warehouse located off of Interstate 17. FRAZIER said that works for him. The UCE said he and his buddy would take care of the other guy (entertain the security guard) so FRAZIER didn't have to worry about him. FRAZIER asked how long he will have for the rip. The UCE said FRAZIER would have some time, but he wouldn't take too long. FRAZIER said he just needs 45 minutes. They discussed finding a place for them to meet up as they got closer to the rip.

8

19.     On July 20, 2015, the UCE conducted another recorded telephone call with FRAZIER. FRAZIER asked if the UCE has good news for him. The UCE said that the driver will head up to Phoenix on Wednesday (July 22nd) with the load vehicle. FRAZIER asked what time it will be and the UCE said that they would start driving in the morning and arrive in Phoenix in the afternoon. FRAZIER asked if the UCE has an idea where it will be stashed. The UCE said that it will be in a warehouse area off of I-17. FRAZIER said that is a big area and asked if it would be south of I-10 or north of I-10. The UCE said he doesn't know yet because they used different places. The UCE asked if FRAZIER was good with it and FRAZIER said yes. FRAZIER said his guys were ready to move right now and they were all good to go. The UCE said he already had the stuff sold off to potential buyers so he could get the money to FRAZIER soon afterward. FRAZIER said that their only concerns are getting the package. FRAZIER said that he already had two spots picked out in the east valley where they can do the exchange with the UCE for the cocaine. The UCE said he will meet up with FRAZIER real quick beforehand and then show FRAZIER where the location of the drugs. FRAZIER said that his guys thought it was going down today, but he was good with waiting until Wednesday. The UCE reiterated that he wanted to make sure FRAZIER and his guys (later identified as ROBERT DEATHERAGE and ERIK FOSTER) were good because he has buyers already. FRAZIER asked how much (cocaine) will be there and the UCE said it would most likely be 10 kilos, maybe more. FRAZIER said that was good and they already agreed on a price, so he told the UCE to call him Wednesday morning. FRAZIER said he would meet up with the UCE to have him show him where the drugs are and that his guys will be following them around. He said his guys were ready to go at the drop of a hat. The UCE said he just wanted to make sure it was done nice and professional so they could keep doing it a couple more times in the future. FRAZIER said his guys are good

to go. The UCE asked if they've done this before and FRAZIER responded that they have. FRAZIER said they've done a lot of different things and they have all acquired a body count on different continents. FRAZIER said this will be a walk in the park as long as everything was cool on the UCE's end and no "heat" was drawn in. FRAZIER said that if "heat" was there, there wouldbe a firefight and that would be the last time they do business together. The UCE said no one will be there.

20. On July 22, 2015, FRAZIER met with the UCE in Phoenix, Arizona to discuss final details of the drug rip. FBI surveillance observed FRAZIER, DEATHERAGE and FOSTER follow the UCE in a black Toyota Camry driven by FOSTER to a warehouse located on 39th Avenue in Phoenix, Arizona. The Toyota Camry did not have a license plate on the vehicle. Surveillance then observed the Camry drive around the vicinity of the warehouse for approximately 15 minutes in an apparent reconnaissance of the site. Eventually, the Camry containing all three defendants drove up to the warehouse gate and stopped. Surveillance observed FRAZIER and FOSTER exit the Camry and FRAZIER cut the lock on the gate. FRAZIER and FOSTER then proceeded on foot into the gated area of the warehouse. This gated area of the warehouse was under recorded video observation in addition to being observed by FBI surveillance. While under recorded video observation, FRAZIER gained access to a Hyundai Tucson while FOSTER acted as security. The Hyundai Tucson contained one package of actual cocaine weighing approximately one kilogram and nine packages of cocaine stimulant that also weighed approximately one kilogram each. These packages were wrapped in red plastic wrap and secured with packaging tape. While under recorded observation, FRAZIER grabbed six of the packages, including the one containing actual cocaine. Surveillance then observed FRAZIER and FOSTER proceed on foot back to the Camry where DEATHERAGE

was waiting in the driver's seat. The Camry containing the three defendants, drove away from the warehouse at a high rate of speed. As they were departing, FBI SWAT attempted to stop the Camry by pursuing it in several vehicles all of which were flashing their emergency lights and sounding their police sirens. The Camry didn't yield and continued to flee from FBI SWAT at a high rate of speed. In the interest of public safety, the chase was called off, but surveillance of the Camry was maintained via an FBI aircraft. Surveillance observed one of the subjects throw a bag out of the window of the Camry in the vicinity of 43rd Avenue and Grand Avenue in Phoenix. This bag was eventually recovered by an FBI surveillance team and contained the six packages that had been removed from the Hyundai Tucson by FRAZIER, including the package containing the actual cocaine. Surveillance continued to follow the Camry and observed it pull into a garage of a residence located at on East Anderson Avenue in Phoenix, Arizona. FBI SWAT then surrounded the residence and called out all of the occupants, including FRAZIER, DEATHERAGE, and FOSTER who were placed under arrest. The fourth occupant was Frazier's girlfriend, who was renting the property. Signed written consent to search the property was acquired from the Frazier's girlfriend and during a subsequent search of the residence, and numerous rifles, assault rifles, and handguns were seized as evidence.

21.     FRAZIER was interviewed after his arrest at the FBI building in Phoenix and the interview was recorded on video and audio. After waiving his Miranda rights, FRAZIER admitted to conducting the drug rip at the warehouse with DEATHERAGE and FOSTER and stated they intended to sell the stolen cocaine to the UCE later that day for a total and splitting the money evenly between the three of them. FRAZIER admitted that during the rip, he was carrying a pistol and had his assault rifle stored in the getaway vehicle. FRAZIER also stated that during the rip DEATHERAGE and FOSTER also had assault rifles and pistols in their

possession and that these firearms were among those seized from the East Anderson residence. FRAZIER also admitted that near an intersection with Grand Avenue, while fleeing from the FBI SWAT units, they threw a bag out of the passenger side of the Camry and that this bag contained the stolen drugs.

22. Based on the facts set forth in this affidavit, your affiant submits that there is probable cause to believe that on or about July 22, 2015, FRAZIER, DEATHERAGE and FOSTER knowingly and intentionally combine, conspire, confederate and agreed together and with others to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, its salts, optical and geometric isomers, and salts of isomers, a Schedule II Controlled Substance, in violation of Title 21, United States Code, § 841(a)(1) and 846.

_____
John E. Kelly, Task Force Officer
Federal Bureau of Investigation

Sworn to and subscribed before me this 23rd day of July, 2015.

_____
Honorable Bridget S. Bade
United States Magistrate Judge