```
 1                    UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ARIZONA

 3

 4   United States of America,      )
                                    )
 5              Plaintiff,          ) No. CR 15-924-PHX-GMS
                                    )
 6        vs.                       ) Phoenix, Arizona
                                    ) July 18, 2016
 7   Parris Frazier,                ) 9:39 a.m.
                                    )
 8              Defendant.          )
     _____)
 9

10            REPORTER'S TRANSCRIPT OF PROCEEDINGS

11         BEFORE THE HONORABLE G. MURRAY SNOW

12                   (Sentencing Hearing)

13

14   Appearances:

15   For the Plaintiff:      Joseph E. Koehler
                             Assistant United States Attorney
16                           UNITED STATES ATTORNEY'S OFFICE
                             Two Renaissance Square
17                           40 North Central, Suite 1200
                             Phoenix, Arizona  85004-4408
18                           (602) 514-7500

19   For the Defendant:      James P. Buesing, Esq.
                             BUESING LAW OFFICE, P.L.L.C.
20                           20403 N. Lake Pleasant Road
                             Suite 117-474
21                           Peoria, Arizona  85382
                             (602) 920-2564
22
     Court Reporter:         Gary Moll
23                           401 W. Washington Street, SPC #38
                             Phoenix, Arizona  85003
24                           (602) 322-7263

25   Proceedings taken by stenographic court reporter
     Transcript prepared by computer-aided transcription
```

1                    P R O C E E D I N G S

2

3          THE COURT:  Please be seated.

4          THE CLERK:  This is CR 15-924, United States of

5    America versus Parris Frazier, on for sentencing.                    09:39:27

6          MR. KOEHLER:  Good morning, Your Honor.  Joe Koehler

7    appearing for Lisa Jennis for the United States.

8          THE COURT:  Good morning, Mr. Koehler.

9          MR. BUESING:  And good morning, Your Honor.  James

10   Buesing appearing on behalf of Mr. Frazier, who is present and       09:39:38

11   ready to proceed with sentencing.

12         THE COURT:  Mr. Buesing.

13         Mr. Frazier, good morning, sir.

14         THE DEFENDANT:  Good morning, sir.

15         How are you, sir?                                              09:39:46

16         THE COURT:  I'm fine this morning.

17         How are you doing?

18         THE DEFENDANT:  Very well.  Thank you, sir.

19         THE COURT:  Good.  You're aware that you're here to be

20   sentenced for the crime of possession of a firearm in               09:39:54

21   furtherance of a drug trafficking offense.  You entered a plea

22   agreement with the United States in which you pled guilty to

23   that offense.

24         I believe I've already accepted your guilty plea,

25   isn't that right, Kathleen?                                          09:40:07

1          Yes, I have already accepted your guilty plea.  And

2   when I did accept your guilty plea, the United States Probation

3   Department prepared a presentence investigation report.  It

4   looks like this.

5          And you're entitled to know everything that's in the          09:40:26

6   report, because I should be sentencing you based on correct

7   information.  And for that reason, when a copy of the report

8   was completed, it was given to Mr. Buesing, with the

9   expectation that he would review it with you in its entirety.

10          Did you do that, Mr. Buesing?          09:40:40

11          MR. BUESING:  Yes, Your Honor.

12          THE COURT:  And does the defense have any objection to

13   any of the factual statements or guideline calculations

14   contained in the report?

15          MR. BUESING:  No.          09:40:48

16          THE COURT:  Okay.  How about the government,

17   Mr. Koehler?

18          MR. KOEHLER:  No objections to the presentence report,

19   Your Honor.

20          THE COURT:  All right.  Neither the facts nor the          09:40:55

21   guideline calculations?

22          MR. KOEHLER:  Correct, Your Honor.

23          THE COURT:  Let me just review what I understand to be

24   the terms of your plea agreement, or the essential terms,

25   Mr. Frazier, so we can both be sure we're operating on the same          09:41:06

CR15-924-PHX-GMS, U.S. v. Frazier, 7/18/16 Sentencing Hearing

1   basis of information.

2          In exchange for your plea of guilt to Count 2 of the

3   indictment, which is the count that charges you with possession

4   of a firearm in furtherance of a drug trafficking offense, the

5   United States stipulated -- now, "stipulated" is a legal word          09:41:21

6   that means a kind of a binding agreement.  They can't control

7   what I do, but they can control the plea agreement.  And they

8   stipulated with you that you'd receive a sentence between 72

9   and 122 months.  So that leaves the discretion to me between 72

10  and 122 months, but they stipulated you wouldn't receive more        09:41:43

11  than that, and you stipulated that you wouldn't receive less

12  than that; that you would provide a full accounting of assets;

13  that you would get a three-level reduction in the number called

14  your Criminal Offense Level.

15         And your Criminal Offense Level is a number between 1          09:42:03

16  and 43 which, together with your criminal history, provides a

17  recommended range of months in which I sentence you according

18  to the federal sentencing guidelines, generally.  In your case,

19  it's a little bit different.

20         The government also agreed to dismiss Count 1, you            09:42:17

21  agreed to forfeit all the firearms that are listed in your plea

22  agreement in section 8B, and you agreed to waive any defenses,

23  appeal rights, or rights to collaterally attack any -- this

24  sentence at any future time.

25         Are those the essential terms of your plea agreement          09:42:35

———CR15-924-PHX-GMS, U.S. v. Frazier, 7/18/16 Sentencing Hearing———

1    as you understand it?

2            THE DEFENDANT:  Yes, sir.

3            THE COURT:  Okay.  Mr. Buesing, I've read the letters

4    from Janet Frazier, is it Gallison, C.J. Frazier, Vicki Davis,

5    Juliette Snider, Donna -- is it Nadeau?  Can't read my own          09:42:57

6    writing -- Nancy Grutman, and somebody else who I -- I must

7    have been writing this late at night.  It is (phonetic)

8    Aroar -- oh, (phonetic) Roar, Angela Roar.  I've read all those

9    letters.

10           What else do you have to say by way of allocution?         09:43:17

11           MR. BUESING:  Did the Court also receive my sentencing

12   memorandum?

13           THE COURT:  I did, and I read your sentencing

14   memoranda.

15           Let me tell you what -- let me tell you what's really      09:43:29

16   going to engage me here.  The government, I think, makes a

17   pretty convincing case that your client said some very

18   offensive things that are very concerning and not very wise.

19   I'm not really concerned about any of them.  You've said that

20   they're puffery, and I can accept that they may well have been     09:43:48

21   puffery.

22           There is one that concerns me, and that is the

23   representation to the confidential informant that he was

24   capable and willing to kill his cousin.  That's the one -- I

25   mean, I think the others are reprehensible, they're not very       09:44:03

1    smart, but they're not going to add to his Criminal Offense

2    Level unless they can -- the government can demonstrate that he

3    actually did something about them.

4         But the one that concerns me is his willingness in

5    engaging in the transaction to actually enter into negotiations        09:44:17

6    to kill who -- whom he believed to be the confidential

7    informant's cousin.  That's what concerns me.  So if you want

8    to directly address what concerns me, that's it.

9         MR. BUESING:  Yes, Your Honor.  I think when --

10   ultimately, the Court asked if we had any objection to the             09:44:37

11   presentence report.  I don't have an objection.  That's why in

12   the sentencing memorandum I filed I was wanting to place more

13   of those comments in context in which they happened.

14        Now, in this case it's something that --

15        THE COURT:  Well, here's why it concerns me.  I mean,            09:44:55

16   in the context of negotiating the deal in which he actually did

17   hit what he thought to be cars stashed with drugs, he was

18   negotiating to kill somebody, and that seems to me to be a

19   little bit more than puffery.

20        MR. BUESING:  I understand, Your Honor.  And this                09:45:11

21   particular conversation with the undercover officer happened

22   over the course of a couple months.  In fact, there was a

23   period of time for about I want to say six weeks where they

24   didn't speak at all and the undercover was not able to reach

25   Mr. Frazier.                                                          09:45:33

1        And so Mr. Frazier had just been working repairing air

2   conditioners and doing as he normally does, but when the

3   undercover contacted him to ask him, you know, "Where have you

4   been?" my client's response was, "Well, we were out of the

5   country on a job."                                           09:45:50

6        So I guess the reason I explained that is because it

7   falls in line with the comment about the undercover's supposed

8   cousin, I guess, in the course of the conversation, that Parris

9   was interested in trying to get funds to put back into their

10  patriotic operation.  In his conversation with the undercover, 09:46:10

11  it was presented to him that the undercover was doing these

12  things because his cousin was running this operation for the

13  cartel bringing things in and organizing things going out of

14  the United States, and how he wanted to do all these things to

15  make his cousin look bad.  And when I was listening to the     09:46:35

16  conversations that were recorded with Parris, it was presented

17  by Parris that, Well, we could just take care of your cousin.

18       And it -- to address the Court's concern specifically,

19  it all fell in line with Parris just basically trying to say

20  things that rose to the level of who he thought he was dealing  09:47:00

21  with.  Because in my conversations with Parris, his ultimate

22  goal was to effectuate some type citizen's arrest with regard

23  to the undercover officer.

24       Like I said in my memoranda, looking back with 20/20

25  hindsight, as misguided as those thoughts might be, that was   09:47:24

CR15-924-PHX-GMS, U.S. v. Frazier, 7/18/16 Sentencing Hearing

1   the thought process that he was going through.  It wasn't

2   something where he -- he was actually going to participate in

3   the murder of somebody else.  This wasn't a situation where he

4   was actually a mercenary or any of these things that he

5   presented to the undercover officer.  He presented that he          09:47:42

6   worked with professionals, that he was a mercenary, he was all

7   these things and willing to do these things, but in reality, he

8   basically worked in heating and air-conditioning and was trying

9   to obtain funds for his personal things that he was passionate

10  about.                                                               09:48:06

11          And so again, to address the Court's concern about him

12  offering to kill the undercover's cousin, that was just in the

13  course of these many conversations that they had and he's just

14  throwing things out there.  He didn't actually intend to do any

15  of these things, and he didn't actually do any of these things.    09:48:29

16          And that's, I guess, at the basis, the reason that I

17  tried to provide some clarification about these conversations,

18  and that what was presented to the undercover officer was

19  something much different than what reality was, from Parris's

20  perspective.                                                         09:48:48

21          And so it's -- that's why I pre- -- or tried to

22  present some clarification and context with regard to what's

23  presented in the presentence report, because what's said in the

24  presentence report does come from the investigation, but it's

25  solely from the recordings.  But when you look at the               09:49:04

1  recordings and what was said to the undercover officer, who he

2  thought was a cartel member, and what was actually a reality

3  from Mr. Frazier's perspective, that's the reason I say that a

4  lot of what was said to the undercover officer was just

5  posturing to try to seem like he was legitimate and could                09:49:26

6  actually be an individual that could participate in trying to

7  take this money.

8       THE COURT:  Mr. Frazier, do you have anything you'd

9  like to say prior to sentencing?

10       THE DEFENDANT:  Yeah.                                              09:49:42

11       THE COURT:  Would you please speak into a microphone

12  so I can hear you.

13       THE DEFENDANT:  Yes.  Yes, Your Honor.  I think

14  Mr. Buesing has hit the nail on the head.  I -- I'm just -- I'm

15  just an -- an old person that's trying to make my way through        09:49:55

16  life.  I -- you know, a lot of these things that were said were

17  said -- it was a bolstering thing, because I was under the

18  impression that this person was who he said he was.

19       I don't have it in me to go kill anybody, I really

20  don't, because I just don't have it in me, you know.  I made a      09:50:17

21  very big mistake in all this stuff.  I thought I was doing the

22  right thing and it -- and it turned around and it bit me in

23  the -- in the behind.

24       I thought that I could get away with, you know,

25  setting this thing up, getting -- getting -- making -- having        09:50:35

CR15-924-PHX-GMS, U.S. v. Frazier, 7/18/16 Sentencing Hearing

1   everything go down and then turning him over to law enforcement

2   using Arizona Revised Statutes, you know, citizen's arrest,

3   felony drug, stuff like that, so I bolstered it up and, you

4   know, it backfired on me.

5       I -- I don't know what else to say, Your Honor, other    09:50:54

6   than I'm sorry.

7       THE COURT:  Thank you.

8       Mr. Koehler.

9       MR. KOEHLER:  Your Honor, the government respectfully

10  disagrees with the notion that this is mere social --    09:51:02

11      THE COURT:  Could I get you to --

12      MR. KOEHLER:  Absolutely.  The government respectfully

13  disagrees with the notion that this is mere social puffery on

14  the part of the defendant.  First off, the conversation with

15  the undercover agent about killing the agent's cousin came    09:51:17

16  before the break in communications.  That came in March and

17  April of 2015.  The break in communications was from mid-April

18  to about mid-June of 2015.  And the defendant was out of state

19  and had left his so-called burner phone apparently back in

20  Arizona while he was gone, and that's why the break in    09:51:36

21  communications took place.

22      But importantly, the undercover agent merely talked

23  about making his cousin look bad in order to create disfavor

24  for the cousin within the organization and increase

25  opportunities for the undercover agent.  Meanwhile, the    09:51:53

1    defendant on his own came up with the idea of offering to kill

2    the cousin and get him out of the way.  And that obviously led

3    to the agency being very careful in terms of how they staged

4    the operation so that there would be nobody in the vicinity of

5    those vehicles.                                              09:52:13

6           The defendant and his cohorts showed up armed and

7    ready for action when they did so.  In addition, the

8    defendant -- this isn't the only time the defendant has shown

9    up ready for action.  He showed up at the Bundy ranch ready for

10   action there after making the postings that he made and        09:52:31

11   encouraging other people to come join him at the (phonetic)

12   Bundy Ranch to stand up to the federal government.  This is an

13   armed standoff that occurs; this is not just somebody making a

14   call-out or a shout-out over Facebook.  This is --

15          THE COURT:  What should we do with our --              09:52:45

16          MR. KOEHLER:  -- somebody who's following through.

17          THE COURT:  -- congressmen who did the same thing,

18   Mr. Koehler?

19          MR. KOEHLER:  I'm sorry?

20          THE COURT:  What should we do with our Congress people 09:52:53

21   who did the same thing?

22          MR. KOEHLER:  The difference is is they didn't take

23   the next step, which is to engage in a drug -- drug rip while

24   armed.  And so there's this extra step that he's taking that

25   shows that, you know, he's not just there for show; he's there 09:53:08

1    to actually do something.

2            Fortunately, nothing occurred, and fortunately, when

3    the police confronted him after the drug rip, he fled instead

4    of engaging in an armed standoff with police in that scenario.

5    But the simple fact is is he was in fact ready for action.          09:53:26

6            And so this isn't just the -- the commentary of

7    somebody seeking to post -- puff up his social image; this is

8    somebody who's ready for action, this is somebody who's

9    dangerous, and the government stands by its recommendation.

10   Thank you.                                                          09:53:41

11           THE COURT:  Um-hum.

12           Let me ask you, Mr. Koehler, is there any evidence,

13   other than what's on the Facebook page -- and I grant you, it's

14   concerning; it's offensive -- is there any evidence other than

15   the Facebook page and the Bundy ranch incident that this         09:53:56

16   defendant has actually ever engaged in actual acts of violence

17   or prepared to engage in actual acts of violence?

18           MR. KOEHLER:  No, Your Honor.

19           THE COURT:  Thank you.

20           Well, Mr. Buesing, when I sentence somebody, this is      09:54:21

21   what I have to do:  I have to consider the nature and

22   circumstances of the offense and the history and the

23   characteristics of the offender.  The nature and circumstances

24   of your offense were highly dangerous and they're serious,

25   and -- so I have to take that into account.                       09:54:57

1        You don't have much of a criminal history.  You do

2   have some misdemeanor offenses that involve a little bit of

3   violence and poor judgment, but -- but they are misdemeanors; I

4   recognize that.

5        Then I have to consider -- I have to apply a certain          09:55:11

6   number of sentencing factors that are set forth in the statute.

7   I have to have the sentence reflect the seriousness of the

8   offense, which is a major consideration for you.  I have to

9   have it promote respect for the law and provide a just

10  punishment.  I have to have it deter not just you, but others     09:55:28

11  who are aware of this matter, from engaging in criminal conduct

12  like this.  So it isn't just considering what's fair to you;

13  it's considering what's necessary to deter the public.

14       I have to protect the public from further crimes that

15  you might commit, I have to consider the federal sentencing       09:55:45

16  guideline ranges, and I have to consider how I sentence other

17  people who are similarly situated.

18       The kind of rhetoric in which you engage is offensive

19  and concerning, but we still have the First Amendment in this

20  country.  You can say what you want to say and I'm not going to   09:56:01

21  hold that against you even if I don't personally agree with it.

22       I do think, though, that when you start volunteering

23  to kill somebody, that, in and of itself, is, arguably, a

24  separate crime, for which you were not charged; and even if it

25  was puffery -- and I can understand that it may well have been    09:56:20

1    puffery -- it does represent a concern that I think needs to be

2    taken into account in sentencing about how far you were willing

3    to go.

4         And so I'm not going to give you the low end of the

5    guideline range, but by the same token, I suspect that it is          09:56:40

6    most likely that what you were engaged in was puffery, that you

7    engaged with your friends and those who see the world the way

8    you do in extremely dangerous activity, and it was criminal

9    activity.  And even if you wanted to do citizen's arrests under

10   the A.R.S., you engaged in criminal activity, and you have no        09:57:04

11   authorization to engage in criminal activity.

12        And so I do think it deserves some serious punishment,

13   but I'm not going to sentence you at the high end of the range,

14   because I think you were, frankly, very unwise to say stupid

15   and dangerous [sic].  But I don't see sufficient evidence to        09:57:30

16   sentence you in the high end of the guideline range because --

17   for re- -- well, essentially, for the reasons that I've

18   explained.

19        Even though I don't agree with your speech, you have

20   the right to speak.  You don't have the right to commit a           09:57:44

21   crime, and you did do it in circumstances in which I can

22   understand that the government thinks you're a dangerous person

23   and the public needs to be protected from you.  I hope that

24   when you get out you'll demonstrate that you are not such a

25   person --                                                           09:57:57

UNITED STATES DISTRICT COURT

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  -- and that you'll comply with the terms

3     of your supervised release.

4          So I'm going to give you an 84-month sentence.  That's

5     seven years, it's one year more than the minimum I could have          09:58:05

6     imposed, and I believe it's three years less than the maximum.

7     And that is the best way I can balance the various

8     considerations I've discussed with you.

9          I do hope, sir, that you will have a successful -- by

10    that I mean an uneventful incarceration; that you will, when          09:58:25

11    you get out, comply with the terms of your supervised release;

12    and that you will lead a peaceful and law-abiding life.  And

13    even if you have strong feelings about immigration, about other

14    matters, that you will confine yourself to legal activity.

15         THE DEFENDANT:  Yes, Your Honor.          09:58:42

16         THE COURT:  Pursuant to the Sentencing Reform Act of

17    1984, it's the judgment of the Court that Parris Frazier is

18    hereby committed to the Bureau of Prisons for 84 months.

19         The defendant shall pay a special assessment of $100,

20    which shall be due immediately.          09:58:52

21         The Court finds that the defendant does not have the

22    ability to pay and orders that any other fine be waived, which

23    means that you'll pay a total of $100 in criminal monetary

24    penalties, and that amount is due immediately.

25         Having assessed your ability to pay that amount, the          09:59:10

CR15-924-PHX-GMS, U.S. v. Frazier, 7/18/16 Sentencing Hearing

1   payment of the total criminal monetary penalties is due as

2   follows:  The balance is due in equal monthly installments of

3   $25 over a period of four months, to commence 60 days after

4   your release from imprisonment.

5           During your incarceration, payment of criminal                    09:59:23

6   monetary penalties is due at a rate of no less -- or not less

7   than $25 per quarter, and payments shall be made through the

8   Bureau of Prisons Inmate Financial Responsibility Program.

9           Criminal monetary payments shall be made to the Clerk

10  of the United States District Court, Attention: Finance,          09:59:42

11  Suite 130, 401 West Washington Street, SPC 1, Phoenix, Arizona

12  85003-2118.

13          Payments should be credited to the various monetary

14  penalties imposed by the Court in the priority established

15  under 18, United States Code, Section 3612(c).                    09:59:57

16          The Court hereby waives the imposition of interest and

17  penalties on any unpaid balance.

18          Upon your release from imprisonment, you shall be

19  placed on supervised release for five years, and while you are

20  on supervised release you shall comply with the standard         10:00:12

21  conditions of supervision as adopted by this Court in General

22  Order 12-13.

23          Of particular importance:  You shall not commit

24  another federal, state, or local crime during the term of your

25  supervision.                                                       10:00:25

1      Within 72 hours of your release from the custody of

2  the Bureau of Prisons you shall report in person to the

3  probation office in the district to which you were released.

4      You shall comply with the following additional

5  conditions:  You shall participate in a mental health program          10:00:38

6  as directed by the probation officer, which may include taking

7  prescribed medication.  You shall contribute to the cost of

8  treatment in an amount to be determined by the probation

9  officer.

10     You shall not uti- -- pardon me.  You shall not          10:00:52

11  utilize, by any means, any social networking forums offering an

12  interactive user-submitted network of friends, personal

13  profiles, blogs, chat rooms, or other environment which allows

14  for interaction with others, without prior written permission

15  from the probation officer.          10:01:09

16     You are prohibited from associating or contacting

17  militia members, past and current, throughout the term of

18  supervision.

19     You shall comply with the standard condition of

20  supervision requiring full-time employment at a lawful          10:01:21

21  occupation.  This may include participation in training,

22  counseling, and/or daily job searching as directed by the

23  probation officer.

24     If you are not in compliance with this condition of

25  supervision, you may be required to perform up to 20 hours of          10:01:33

1    community service per week until employed as approved or

2    directed by the probation officer.

3          You shall submit your person, property, house,

4    residence, vehicle, papers, computers, as defined in 18, United

5    States Code, Section 1030(e)(1), other electronic                    10:01:50

6    communications or data storage devices or media or office, to a

7    search conducted by a probation officer.  Failure to submit to

8    a search may be grounds for revocation of release.  You shall

9    warn any other occupants that the premises may be subject to

10   searches pursuant to this condition.                                  10:02:05

11         You are prohibited from owning, using, or maintaining

12   a firearm.

13         The defendant's interest in the following property

14   shall be forfeited to the United States (as listed

15   in the Indictment): an HK P2000 .40 caliber S&W, serial number

16   123-014011; an HK P2000 magazine; Springfield Armory XD-45 ACP,

17   serial number XD694265; Springfield Armory XD-45 magazine;

18   Arsenal Model SLR-1015 7.62x39 caliber, serial number KP390126;

19   7.62x39 caliber magazine; Spikes Tactical SL-15 lower, serial

20   number SAR54721 with 5.11 sling; Magpul PMAG 5.56x45; Walther

21   PK380, serial number PK081315; a Walther .380 magazine; a Glock

22   17 9x19, serial number WR838; a Glock 17 magazine; Smith and

23   Wesson .357 magnum revolver, serial number NF218732; Smith and

24   Wesson .22 long-rifle CTG revolver, serial number 3K72887; YHM

25   Model YHM-15 5.56, serial number YH021761, with EOTech optic

1    and flashlight; Magpul PMAG 5.56x45; AR-15 Model AR15F, serial

2    number 10695, with flashlight and sling; Magpul PMAG 5.56x45;

3    Sturm, Ruger & Co. Ruger P94, serial number 308-58139; a Ruger

4    P94 magazine; Savage 308, serial number F536903, with scope and

5    sling; a 5.56x45 upper receiver; LG Model L5620 with serial

6    number 408CYKJ0117965; a Samsung flip phone, serial number

7    R21D9AVEZ5W; Samsung Galaxy phone, serial number R28G509NXPY; a

8    YAESU FM Transceiver FT-60, serial number 2M580427; a BAOFENG

9    Dual Band FM Transceiver UV-5RAX+; a BAOFENG Dual Band FM

10   Transceiver UV-5RV2+; Big Horn Arms WTH-S, serial number

11   000242; Big Horn Arms WTH-S, serial number 0001000; and five

12   rounds of Winchester .308 caliber ammunition.

13           Do you understand the sentence as I've imposed it upon

14   you, sir?

15           THE DEFENDANT:  Yes, Your Honor.                      10:05:49

16           THE COURT:  Now, Mr. Buesing, I believe that I have

17   accepted the defendant's plea agreement and sentenced him in

18   compliance with that agreement.

19           Does the defense have any objection to such a finding?

20           MR. BUESING:  No objection, Your Honor.               10:05:58

21           THE COURT:  Does the prosecution have any objection,

22   Mr. Koehler?

23           MR. KOEHLER:  No, Your Honor.

24           THE COURT:  All right.  Then I do so find.

25           And what that means for you, Mr. Frazier, is this:     10:06:06

1   When you entered your plea agreement, you agreed that if I

2   sentenced you in compliance with it you would waive your right

3   to appeal, so I believe you have waived your right to appeal.

4        Despite that waiver, the government doesn't seek to

5   prevent you from raising an argument that for some reason the          10:06:21

6   government engaged in prosecutorial misconduct in bringing

7   these charges against you, or that you were deprived of the

8   effective assistance of counsel in defending yourself against

9   these charges.

10        To the extent, therefore, that you may have preserved          10:06:34

11   some appellate right based on those arguments, you would have

12   also preserved the right to apply for leave to appeal

13   in forma pauperis, assuming you otherwise qualify.  If you

14   exercise that right, then the clerk of the court will prepare

15   and file a notice of appeal on your behalf.  But with few          10:06:51

16   exceptions, any such notice must be filed within 14 days of

17   today's judgment.

18        Do you understand that, sir?

19        THE DEFENDANT:  Yes, Your Honor.

20        THE COURT:  All right.  Anything else on behalf of          10:07:00

21   your client, Mr. Buesing?

22        MR. BUESING:  If I may have just one moment, Your

23   Honor.

24        (Off-the-record discussion between Mr. Buesing and the

25   defendant.)          10:07:12

1    MR. BUESING:  Thank you, Your Honor.

2    Mr. Frazier was asking if the Court would be willing

3  to recommend that he be housed in a facility that's in the

4  Northeast United States.  He's been looking at some programs

5  for the Bureau of Prisons for various counseling and recovery    10:07:49

6  services at facilities located in Pennsylvania.  He's very

7  interested in those.

8    I've explained to him that the Court cannot order that

9  he participate or be housed in a certain location, but he would

10  ask if the Court would be willing to recommend that he be    10:08:10

11  housed at a facility in the Northeast where they have these

12  programs.

13    THE COURT:  Well, I don't know what kind of programs

14  you're talking about.

15    MR. BUESING:  Well, they're counseling programs for    10:08:21

16  substance abuse and --

17    THE COURT:  Do you have any reason to believe your

18  client needs substance abuse counseling?

19    MR. BUESING:  I don't personally, Your Honor, but I

20  will say that I've discussed with him and he's expressed an    10:08:35

21  interest in trying to help others, because he wants to convey

22  things that he's learned onto others to try to assist them from

23  making bad choices, and that includes substance abuse.

24    So I know that he's participated in some programs

25  about substance abuse, also anger management and other things,    10:08:54

1   and so these are all things that he's interested in trying to

2   pursue further so that he can try to --

3           THE COURT:  Any comment on that, Mr. Koehler?

4           MR. KOEHLER:  No, Your Honor.

5           THE COURT:  All right.  Let me tell you, Mr. Frazier,          10:09:10

6   that I don't have any objection to making a recommendation that

7   you be housed somewhere in the Northeast at your request.

8           However, I'm not going to recommend that you

9   participate in substance abuse treatment programs.  I'm not

10  going to deprive you from participating in them if you'd like       10:09:25

11  to and the government has space.  But I will tell you that so

12  many people come through here who have very bad substance abuse

13  problems, which produce crime.  And it's very hard to get into

14  some of the more intense substance abuse treatment programs

15  just because of space limitation.                                   10:09:40

16          I don't have any evidence that you have a substance

17  problem, or at least not sufficient evidence that you do.  To

18  the extent you want to participate and can establish that you

19  should, then you can bring that evidence to the Bureau of

20  Prisons and they can consider that.  To the extent that you        10:09:54

21  merely want to be a participant in learning counseling

22  techniques, you can make that request and I will let them deal

23  with it.  But with those caveats, I'll recommend that you be

24  considered for placement somewhere in the Northeast.  All

25  right?                                                             10:10:10

CR15-924-PHX-GMS, U.S. v. Frazier, 7/18/16 Sentencing Hearing

1          THE DEFENDANT:  Thank you, Your Honor.

2          THE COURT:  All right.

3          THE DEFENDANT:  Appreciate that.

4          THE COURT:  Anything -- let's see.  The government has

5     a count of the indictment to dismiss?                                    10:10:15

6          MR. KOEHLER:  That's correct, Your Honor.  The

7     government moves to dismiss Count 1.

8          THE COURT:  All right.  Count 1 is dismissed.

9          Anything else from either party?

10         MR. KOEHLER:  No, Your Honor.                                        10:10:26

11         MR. BUESING:  No, Your Honor.  Thank you for your

12    time.

13         THE COURT:  Thank you.

14         (Proceedings concluded at 10:10 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4

5

6

7        I, GARY MOLL, do hereby certify that I am duly appointed

8    and qualified to act as Official Court Reporter for the United

9    States District Court for the District of Arizona.

10       I FURTHER CERTIFY that the foregoing pages constitute a

11   full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17       DATED at Phoenix, Arizona, this 29th day of July, 2017.

18

19

20                              s/Gary Moll
                         _____

21

22

23

24

25